Filed 2/28/22  P. v. Channoi CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TOMMY CHANNOI,<br><br>      Defendant and Appellant. | A164247<br><br>(Fresno County<br>Super. Ct. No. F14902036) |

Defendant Tommy Channoi sexually molested two of his female relatives, then 7-year-old S. in 2008 and then 12-year-old C. in 2011.[1]  He was charged with five felonies, two against S. and three against C.  A jury convicted him of one count of lewd acts against S. and one count of lewd acts against C., and it found true the allegations that he committed sex offenses against multiple victims and that the victims were under 14 years old.  The jury could not return a verdict on the three other counts, and the trial court declared a mistrial on them.  Channoi was sentenced to 40 years to life in prison.

On appeal, Channoi makes numerous claims.  He argues that the trial court lacked jurisdiction over the count of lewd acts against C. because the

_____

[1] S. and C. were referred to by only their first names during the proceedings below.

1

charge was added in an improperly filed information and erred by denying his motion to sever the counts involving S. from the counts involving C. He also claims that insufficient evidence supports the conviction involving S. Channoi raises several evidentiary issues as well, claiming that the trial court erred by admitting his interrogation and S.'s forensic interview, that he was improperly precluded from impeaching S. with evidence of her "criminal lifestyle," that a Lao interpreter mistakenly translated some testimony of S.'s grandmother, and that a defense witness was improperly permitted to opine on his guilt. Finally, Channoi contends that the court failed to investigate jury misconduct he raised in a motion for a new trial, that his sentence is unconstitutional, and that cumulative error requires reversal. We reject all these claims and affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Offense Against S.*

At the time of the molestation in 2008, Channoi was about 21 years old and lived in a Fresno apartment with his parents, who were disabled and did not work, and his grandmother. Seven-year-old S. lived with her grandmother in an apartment over a mile away from Channoi's. Channoi's mother is the sister of S.'s grandmother, making S. the daughter of Channoi's first cousin.

S. was 16 years old at the time of trial. She testified that on the occasion in question her grandmother left her at Channoi's apartment. S. and Channoi were the only ones there. S. stated that Channoi called her into a bedroom, and she took her pants off. Channoi then touched her vagina over her underwear with his finger. S. testified the contact ended when her "grandma walked in."

2

S. subsequently entered foster care, and she reported the incident with Channoi to her foster mother in early 2012, when she was 10 years old. A Fresno police officer testified about the statement S. gave at that time, which differed in significant respects from her trial testimony. S. told the officer that while she was in the bedroom with Channoi, he "unbuttoned and unzipped his pants" and placed his penis, which was "hard," inside her vagina. S. reported that he made "an in-and-out motion" with his penis for a few minutes. At trial, however, S. denied that Channoi had intercourse with her. S. also told the officer that Channoi stopped when either her grandmother or his mother called out, contradicting her testimony that she and Channoi were alone in the apartment.

In addition, some evidence suggested that two other aspects of S.'s statement to police were not credible. The officer who took the statement agreed that "one of the things that . . . [S.] was very insistent about was that the person who molested her had a tattoo on his left arm that had a word on it." But Channoi did not have a tattoo on either arm in 2008. S. also told the officer that she often went to Channoi's home to get away from her grandmother. S.'s grandmother, however, testified that she did not have a driver's license at the time of the molestation, never walked to Channoi's house or allowed S. to walk there alone, and had never asked Channoi to babysit S.

In March 2012, a few months after her initial report, S. was interviewed at a Multidisciplinary Interview Center (MDIC), which "is a facility specially designed and staffed for interviewing children suspected of being victims of abuse." (*People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1400.) During the MDIC interview, which was played for the jury, S.

3

described facts consistent with those she had previously reported to the police, including that Channoi had intercourse with her.

To impeach S., the defense also played a more recent interview of her by Channoi's trial counsel during which she denied that Channoi molested her. She told counsel that she had actually been molested by one of her mother's boyfriends. At trial, S. testified that she had lied to counsel because her aunt, who was present during the interview, had pressured her not to say what Channoi did. S. affirmed that Channoi did molest her, stating that while she hoped he did not "ever hate [her], . . . at the end of the day, this is what happened to [her]."

B.    *The Offense Against C.*

Channoi is a second cousin of C.'s father. C. and her family, who lived in San Diego, travelled to Fresno for Thanksgiving in November 2011. At the time, C. was 12 years old and Channoi was 24 years old.

C. was 19 years old when she testified at trial. C. testified that Channoi had sexual intercourse with her against her will while she was in Fresno on that Thanksgiving trip. A few days after Thanksgiving, her Fresno relatives had a party, and Channoi was in attendance. During the party, Channoi asked C. if she wanted to go to a gas station with him, and she agreed. The two left in Channoi's truck, with Channoi driving and C. in the front seat.

After Channoi stopped at a gas station and made a purchase, he asked C. if she wanted to go somewhere else. She said she was not sure, and he began driving around aimlessly. He began touching her leg, and C. testified that she "was too scared to say anything and . . . was just kind of shaking."

Channoi pulled over, and C.'s cell phone began ringing, because her father and stepmother were calling to find her. C. testified that Channoi "put

4

[her] phone onto the dashboard," undid his seatbelt, and "started trying to come over to [her] side of the car." Channoi was touching her legs and chest, and C. told him to stop but he refused. C. tried to reach for her phone, but Channoi pushed her back.

Eventually, Channoi reached for the bag from the gas station, and C. realized he had purchased condoms. C. again asked him to stop, but he started taking off her clothes. She tried to move away from him, but he kept telling her to stop and pushing her back. Channoi finally removed her pants, and he unbuckled his belt and took down his pants.

Channoi then put on a condom, continuing to "push [C.] back so [she] would just stay." C. testified that as she repeatedly asked Channoi to stop, he put his penis into her vagina and had intercourse with her while holding her hands down. After about 10 minutes, he stopped and told her to put on her clothes. He then drove back toward the party and dropped C. off at the corner.

Meanwhile, C.'s stepmother and aunt had been driving around the neighborhood looking for C. They saw her as she was walking back to the party, and she got into the car with them. C. testified that she did not tell them what had happened because "they [were] already yelling at [her] for just disappearing so [she] didn't know what to say." C. also "wasn't getting along with [her] stepmom or [her] dad" during that time, and instead of talking to them she "just blocked it out."

Two years later, in late 2013, C. told her stepmother what Channoi had done. C. then told her father, who called Channoi and confronted him. C.'s father testified that during the call Channoi apologized for "rap[ing]" C. and explained that he had been drunk. Channoi claimed he had "been trying to

5

go to church . . . to better [himself]" and had been meaning to tell C.'s father what had happened.

C.'s father immediately reported the crime to law enforcement. At the request of Fresno police, C.'s father called Channoi again, and the conversation was recorded. During the call, which was played for the jury, C.'s father asked Channoi whether he "use[d] a condom when [he] did that to her, when [he] raped her," and Channoi responded, "Yes." Channoi claimed he had not realized how old C. was and was not thinking about the fact she was his cousin's daughter because he was drunk. According to Channoi, C. never told him to stop and did not resist, but he "quit right in the middle" because "[i]t didn't feel right." At the end of the call, Channoi stated that he was "really sorry for what [he] did" and "didn't mean to hurt [C.]"

*C.      Channoi's Interrogation*

Fresno police interviewed Channoi after receiving C.'s report, and a video recording of the interrogation was played for the jury. During the interrogation, Channoi admitted that he "ha[d] sex" with C. Echoing what he told C.'s father, he said he "was drunk" and "stupid" and did not realize how young C. was. He claimed that C. never asked him to stop or told him it hurt. But he also stated, "I might've forced her, I don't know, I was drunk, you know?"

The police also questioned Channoi about S. Although he initially denied doing anything to her, he eventually admitted that he once put the "tip" of his finger inside her vagina. He stated that he was not drinking and it was "just like stupidity." He also eventually admitted that he touched the outside of S.'s vagina with his penis. Channoi consistently denied, however, that he had intercourse with S. At the end of the interrogation, Channoi wrote letters to both girls in which he apologized and asked for forgiveness.

6

## D.    *Procedural History*

Channoi was originally charged in March 2014.  Four years later, as trial was beginning, the operative information was filed.  As to S., Channoi was charged one count of sexual intercourse or sodomy with a child 10 years of age or younger and one count of lewd acts upon a child, and as to C., he was charged with one count of aggravated sexual assault of a child, one count of forcible rape, and one count of lewd acts upon a child.[2]  It was also alleged that he committed offenses against multiple victims who were under 14 years old, subjecting him to sentencing under section 667.61, the One Strike law.[3]

The jury convicted Channoi of both counts of lewd acts and found that both offenses involved substantial sexual conduct with a victim under 14 years old.  The jury also found true the allegation that he committed sex offenses against multiple victims.  The jury hung on the remaining counts, and a mistrial on them was declared.

Channoi moved for a new trial on all the same grounds he raises on appeal.  In August 2018, the trial court denied the motion and sentenced him to a total term of 40 years to life in prison, composed of consecutive terms of

---

[2] The charges were brought under Penal Code sections 288.7, subdivision (a) (intercourse with child 10 years of age or younger), 288, subdivision (a) (section 288(a)) (both counts of lewd acts), 261, subdivision (a)(2), and 269, subdivision (a)(1) (aggravated sexual assault of a child), and 261, subdivision (a)(2) (forcible rape).  All further statutory references are to the Penal Code unless otherwise noted.

[3] The multiple-victim circumstance was alleged under section 667.61, subdivision (e)(4), as to the rape count and both lewd-acts counts, and the fact that the victims were under 14 years old was alleged under section 667.61, subdivision (j)(2), as to the same three counts.  In addition, it was alleged as to both lewd-acts counts that Channoi was ineligible for probation under section 1203.066, subdivision (a)(8), because he had substantial sexual conduct with a victim under 14 years old.

25 years to life for the offense against C. and 15 years to life for the offense against S.

The following month, Channoi appealed. After delays caused by record preparation and extensions of time requested by both parties, the matter became fully briefed in early 2021. On December 20, 2021, the appeal was transferred from the Fifth District Court of Appeal to this court for decision.

II.
DISCUSSION

A.    *Channoi Forfeited His Challenges to the Amended Information.*

Channoi argues that the lewd-acts conviction involving C. must be reversed because the information was improperly amended after trial began to add that charge. We conclude that he forfeited this claim.

The original information filed in July 2014 included all the counts ultimately alleged except for the count of lewd acts against C. On March 8, 2018, the day trial began, the prosecution filed a first amended information adding that count. At a hearing that day, the trial court received the amended information and noted that Channoi needed to be arraigned on it. Channoi waived "any reading of the information or any advisement of his constitutional and statutory rights" and pleaded not guilty to all counts.

Channoi's trial counsel, who also represents him on appeal, then moved under section 995 to dismiss the newly added count of lewd acts against C. Counsel stated he was making the motion "in an abundance of caution," explaining, "I received the amended information this morning. I have not had an opportunity to review the preliminary hearing transcript with an eye towards determining whether or not there was sufficient evidence presented to meet all of the elements as to [the new count], so therefore we would . . . argue that the evidence is insufficient as to [that count]." The trial court

8

denied the motion without prejudice, noting that counsel could renew it after reviewing the transcript.

Channoi never revisited the issue or otherwise objected to the filing of the amended information, however, until he filed the motion for a new trial. In the motion, Channoi made the same claims involving the amended information that he now raises on appeal, namely that it was improper because (1) it was filed without leave of the trial court and was not verified, in violation of section 1009; (2) it was filed only after plea negotiations failed and without advance notice, in violation of his constitutional rights; and (3) it prevented his counsel from rendering effective assistance because it upended the defense strategy. Citing *People v. Leonard* (2014) 228 Cal.App.4th 465 (*Leonard*), the court rejected these claims because Channoi failed to object at the time the amended information was filed.

We agree with the trial court that Channoi forfeited most of his challenges to the amended information by failing to object when it was filed. (See *Leonard*, *supra*, 228 Cal.App.4th at pp. 481–482.) Although he moved to dismiss the newly added count under section 995, he never claimed that the amended information failed to comply with section 1009, that he received insufficient notice of it, or that it was filed vindictively after plea negotiations failed. Channoi argues that he should be forgiven for failing to object because he did not know the amended information had already been filed when he was arraigned on it, but he does not explain why he could not have objected as soon as he realized this or why he waited to raise the issue until moving for a new trial.

Channoi also states in passing that "[a]n improperly filed pleading is a legal nullity and fails to provide the Court with jurisdiction," but he does not argue that this supposed lack of jurisdiction relieved him of having to object

9

below.  Indeed, *Leonard* rejected a similar argument, holding that even if the trial court erred by failing to exercise its discretion to decide whether to authorize the filing of an amended information, the error did not deprive the trial court of fundamental jurisdiction.  (*Leonard*, *supra*, 228 Cal.App.4th at pp. 481–483.)  Channoi does not address the issue of forfeiture at all, much less explain why *Leonard* does not control.  Therefore, any claim that he was not required to object below because the court lacked jurisdiction is itself forfeited.  (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 (*Badie*) [points not raised on appeal are waived].)

Similarly, although claims of ineffective assistance of counsel are generally preserved even if not raised below, Channoi's claim of ineffective assistance is forfeited because he has not presented "reasoned argument and citations to authority." (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  Channoi may be correct that the defense strategy of admitting consensual intercourse with C. "to pursue a conviction on a lesser included offense, one [that] would not be subject to the enhanced penalties of . . . [section] 667.61," was disturbed once the lewd-acts count was added, since consent is not a defense to that crime. (*People v. Soto* (2011) 51 Cal.4th 229, 233.)  But while Channoi refers in passing to the elements of ineffective assistance of counsel, he does not explain how the facts here entitle him to relief under the applicable legal standards.  Accordingly, the claim fails.

B.      *Channoi's Motion to Sever Was Properly Denied.*

Channoi claims the trial court erred by denying his motion to sever the counts involving S. from those involving C. and he was denied due process as a result.  No error occurred.

Channoi filed the motion to sever shortly before trial.  He argued that little connected the two incidents and that trying the "weak" charges involving S. with the charges involving C. would be "highly prejudicial."  The prosecution responded that the charges were "the same class of crime," involved cross-admissible evidence under Evidence Code section 1108 (section 1108), and "entail[ed] a lot of the same witnesses."

The trial court denied the motion to sever.  In doing so, the court cited "judicial economy" and found that none of the counts were "more inflammatory than the others."  The court also indicated it could not currently determine whether the case involving S. was weaker than the case involving C.

Joinder of criminal counts for trial is authorized under section 954, which provides, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses, under separate counts."  Thus, charges may be tried together "so long as at least one of two conditions is met:  The offenses are (1) 'connected together in their commission,' or (2) 'of the same class.' " (*People v. Soper* (2009) 45 Cal.4th 759, 771 (*Soper*).)  Even if charges are otherwise properly joined, a trial court has discretion, "in the interests of justice and for good cause shown," to "order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."  (§ 954.)

11

Initially, it is unclear whether Channoi disputes that the charged offenses were "of the same class" under section 954. Although he primarily concentrates on joinder's prejudicial effect, he also discusses decisions holding that joinder was impermissible because the offenses were not connected and did not share " 'a common element of substantial importance.' " (*Walker v. Superior Court* (1974) 37 Cal.App.3d 938, 941; *People v. Saldona* (1965) 233 Cal.App.2d 24, 30; *People v. Renier* (1957) 148 Cal.App.2d 516, 520.) To the extent Channoi argues that the crimes here were not of the same class, we reject the claim. "Sex offenses 'belong to the same class of crimes' " under section 954, "because the 'intent to satisfy sexual desires runs through' them," and this is particularly true of sex offenses directed at children. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1112–1113.)

We therefore turn to Channoi's argument that the motion to sever should have been granted because joinder was unduly prejudicial. A defendant who seeks severance on this basis has the burden to show " 'a substantial danger of undue prejudice' " that outweighs " 'countervailing considerations [of efficiency and judicial economy].' " (*Soper*, *supra*, 45 Cal.4th at p. 773, italics omitted.) We begin by "consider[ing] the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Id.* at pp. 774–775.) Only "[i]f we determine that evidence underlying properly joined charges would *not* be cross-admissible . . . [do] we proceed to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its

consideration of the evidence of [the] defendant's guilt of each set of offenses.' " (*Id.* at p. 775.)

We review the denial of a motion to sever for an abuse of discretion, considering the record before the trial court at the time it ruled. (*Soper*, *supra*, 45 Cal.4th at p. 774.) That said, " 'even if a . . . ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law,' " which requires consideration of "the proceedings as a whole." (*Id.* at pp. 783–784.)

Channoi claims that the evidence involving the two victims was not cross-admissible because "the allegations were separated by years and bore no similarities." Generally, under Evidence Code section 1101, subdivision (a), "evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct," is inadmissible "to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Such evidence is, however, admissible under subdivision (b) of that statute to prove " 'a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes.' [Citation.] In this inquiry, the degree of similarity of criminal acts is often a key factor, and 'there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 300.)

But section 1108 " 'radically changed' " these principles in the context of sex-crime cases. (*People v. Loy* (2011) 52 Cal.4th 46, 63.) Under section 1108, subdivision (a), "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual

offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." Thus, evidence of prior sex crimes is admissible " ' "for any relevant purpose," ' " including propensity to commit such crimes. (*Loy*, at p. 63, italics omitted.) In turn, although under Evidence Code section 1101 the required degree of similarity between charged and uncharged conduct "varie[s] depending on the use for which the [other-crimes] evidence [is] offered," under section 1108 " '[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise . . . section 1108 would serve no purpose. It is enough [that] the charged and uncharged offenses are sex offenses as defined in section 1108.' " (*Loy*, at p. 63.) Clearly, the charges at issue are all sex offenses (see § 1108, subd. (d)(1)), and therefore evidence to support them would be cross-admissible in separate trials without regard to their degree of similarity.

Channoi also argues that the evidence was not cross-admissible because "there was no required [section] 1108 notice by the People." Under section 1108, subdivision (b) (section 1108(b)), the prosecution must disclose to the defendant any evidence it wishes to offer under that statute, "including statements of witnesses or a summary of the substance of any testimony that is expected to be offered[,] in compliance with the requirements of Section 1054.7 of the Penal Code." In turn, section 1054.7 requires discovery disclosures to be made at least 30 days before trial "unless good cause is shown why a disclosure should be denied, restricted, or deferred." Here, the prosecution may not have made disclosures specifically pursuant to section 1108, but Channoi does not explain why it needed to do so. The charges were tried together, so the prosecution was already obliged to provide

14

discovery about all the crimes, and Channoi does not explain how those disclosures were inadequate under section 1108(b).

Likewise, to the extent Channoi suggests the prosecution had to give notice that it intended to use his conduct against one victim to prove his conduct against the other victim, we reject the argument. Under *People v. Villatoro* (2012) 54 Cal.4th 1152, section 1108 allows the factfinder to consider evidence of a defendant's other *charged*, not just uncharged, sexual offenses as evidence of the defendant's propensity to commit a charged sexual offense. (*Villatoro*, at p. 1156.) But Channoi provides no authority for the proposition that the defense must receive notice of the prosecution's intent to use other-crimes evidence in this manner, beyond requesting a jury instruction on the issue. (See *ibid.*) Here, the prosecution did request such an instruction, though it later abandoned the request, and the jury was instructed to "consider each count separately." But Channoi fails to explain why, even if the prosecution did not comply with section 1108(b) or the jury was not permitted to consider other-crimes evidence in *this* proceeding, that means that for purposes of section 954 the evidence was not cross-admissible.

Finally, even if the evidence was not cross-admissible, that factor alone does not require severance. (*Soper*, *supra*, 45 Cal.4th at pp. 779–780.) Rather, if cross-admissibility is lacking, we consider the other relevant factors in determining whether a motion to sever was erroneously denied: "(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for

15

prejudice to the defendant from a joint trial against the countervailing benefits to the state," namely "conservation of judicial resources and public funds." (*Id.* at pp. 774–775, 780.)

Channoi concentrates on the second of these factors in arguing that joinder was unduly prejudicial. He claims that "the case [involving S.] should be classified as weak . . . [,] since it presented a legitimate chance of acquittal, whereas [the lewd-acts count] involving [C.] did not." Specifically, whereas he conceded he had intercourse with C., making the conviction for lewd acts against her a foregone conclusion, "he vehemently contested" the charges involving S., who gave inconsistent statements about what occurred. "A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,'" with the focus being instead on whether "the proffered evidence was sufficiently strong in both cases." (*Soper*, *supra*, 45 Cal.4th at p. 781.) In making this argument, Channoi fails to acknowledge that he admitted to police that he molested S. Whatever the weaknesses in the case involving her may have been, they were significantly dispelled by his confession to the conduct for which he was ultimately convicted. Thus, Channoi has not shown the risk of prejudice outweighed the benefits of joinder such that the trial court abused its discretion in denying the motion to sever, much less that he was denied due process.

C. *Substantial Evidence Supports the Conviction Involving S., and the Trial Court Did Not Err by Denying Channoi's Motion for a New Trial on that Ground.*

Channoi argues that his conviction for lewd acts against S. must be reversed because she "was an incredible witness," and thus there was insufficient evidence "to support a reliable determination of guilt." We are not persuaded.

16

Channoi was convicted of molesting S. under section 288(a), which provides that "a person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony." This provision "is violated if there is ' "any touching" of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child.' " (*People v. Villagran* (2016) 5 Cal.App.5th 880, 890.)

To begin with, it is unclear whether Channoi is making a traditional substantial-evidence claim or arguing that the trial court erred by denying his motion for a new trial on this ground. Although he never mentions the court's ruling, he cites only the standard of review we use when reviewing the denial of a motion for a new trial. In an abundance of caution, we will address both potential claims.

1.  Substantial evidence supports the conviction.

To resolve a claim of insufficient evidence, "we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [factfinder] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Reversal is

17

unwarranted " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the . . . verdict." (*Ibid.*)

Channoi does not dispute that S. testified about conduct that satisfied the elements of section 288(a). Rather, he points to "huge logical gaps" in her story, including "how she even . . . traveled over a mile alone to the Channoi house on the date in question . . . , the whereabouts of the elderly and unemployed inhabitants of the Channoi house at the time . . . , the lack of tattoos she so clearly recalled on her perpetrator . . . , and the non-occurrence of the event that she claims ended the molestation, i.e., her grandmother's arrival." These discrepancies do not require reversal.

"While an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is so rare as to be almost nonexistent. ' "To warrant the rejection of the statements given by a witness who has been believed by [the factfinder], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728–729.) The supposed gaps in S.'s story do not establish that the sexual molestation S. described could not possibly have happened. Rather, even if she misstated some of the details about what happened—which is not surprising, given Channoi molested her when she was only seven years old—it was the jury's function to determine how those discrepancies affected her credibility. We cannot reject *all* her statements simply because some of them might not be believable. Moreover, Channoi again fails to acknowledge that he admitted to molesting S. Thus, even if some of the details of S.'s story were inaccurate, Channoi's confession buttressed the conclusion that he did, in fact, commit a lewd act against her in violation of section 288(a).

Channoi also asserts that "[t]o allow the conviction to stand based on the trial record would deprive [him] of his rights to due process, equal protection, a fair and impartial trial, and to be free from cruel and unusual punishment" under the federal and state constitutions. He does not identify any separate reason his constitutional rights were violated, however, so we reject this claim based on our conclusion that substantial evidence supports the conviction.

2. The trial court properly denied the motion for a new trial.

We now turn to whether the trial court improperly denied the motion for a new trial made on the ground of insufficient evidence. Section 1181(6) authorizes a new trial "[w]hen the verdict or finding is contrary to law or evidence." When considering whether to grant relief under this provision, a trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) The court "is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The . . . court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.'" (*People v. Davis* (1995) 10 Cal.4th 463, 523–524.)

We review the denial of a motion for a new trial for an abuse of discretion. (*People v. Davis*, *supra*, 10 Cal.4th at p. 524.) " ' "The determination of [such] a motion . . . rests so completely within the [trial] court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*Ibid.*)

19

Channoi does not argue that the trial court misunderstood or misapplied the standards governing a motion for a new trial under section 1181(6). Nor does he claim that the ruling was wrong for any reason other than the ones we rejected in concluding that substantial evidence supports the conviction involving S. Thus, based on that evidence, we likewise conclude that the court properly denied the motion for a new trial. (See *People v. Clark* (2011) 52 Cal.4th 856, 1002.)

> D.    *Channoi Waived His Challenges to the Admission of His Interrogation.*

Channoi argues that his interrogation should have been excluded because (1) he did not validly waive his *Miranda*[4] rights and (2) his arrest was unlawful, making his statements during the interrogation "inadmissible as the 'fruit of the poisonous tree.'" We reject both claims because he fails to support them with sufficient argument and citations to authority.

Before trial, Channoi moved to exclude his interrogation on the same two grounds he now raises.[5] The trial court held a hearing on the issue under Evidence Code section 402, at which the detective who arrested and interrogated Channoi testified. After reviewing the recording of the interrogation, the trial court denied the motion, finding that Channoi's statements were "admissible based upon the totality of the circumstances and all of the evidence that's been adduced." When Channoi again raised this issue in the motion for a new trial, the court affirmed its pretrial ruling.

Channoi first claims that he was "improperly Mirandized" because although the detective read him his rights before questioning him, the

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

[5] Channoi also argued below that the pretext call with C.'s father should be excluded and his interrogation statements were involuntary, but he does not renew either claim on appeal.

20

detective "never asked [him] if he waived his rights and wished to be interviewed" but "just immediately began interrogating [him]." Channoi cites several cases affirming the general principle that a defendant must knowingly and intelligently waive the privilege against self-incrimination and the right to an attorney before an interrogation can proceed without counsel being present. (E.g., *North Carolina v. Butler* (1979) 441 U.S. 369, 373.) But he does not even describe the details of his interrogation, much less attempt to demonstrate how they did not support a finding of a valid implied waiver under governing case law. If a suspect has " 'heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1216.) An appellant has the burden to demonstrate reversible error on appeal and " 'cannot simply say the [lower] court erred, and leave it up to the appellate court to figure out why.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237.) Therefore, we treat the argument as waived.

Channoi also claims that his interrogation statements should have been excluded because he was unlawfully arrested in his home without a warrant. Again, however, he fails to discuss the circumstances of his arrest or explain why they establish a Fourth Amendment violation under the authorities he cites. Accordingly, we conclude this claim is also waived. (See *People v. JTH Tax, Inc.*, *supra*, 212 Cal.App.4th at p. 1237; *Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

E.      *The Trial Court Properly Admitted S.'s Forensic Interview.*

Channoi argues that the admission of S.'s MDIC interview violated his constitutional right to confront witnesses. We are not persuaded.

21

Before trial, Channoi moved to exclude S.'s out-of-court statements, stating that his "investigation show[ed] that [S. was] unavailable to testify" and the admission of such statements would therefore "violate [his] constitutional rights to confrontation." The prosecution, on the other hand, moved to admit the MDIC interview under Evidence Code section 1360 (section 1360), which provides that the statements a victim of child abuse or neglect makes when the victim is under 12 years old are "not made inadmissible by the hearsay rule" if certain requirements are met. (§ 1360, subd. (a).)

At a hearing on the motions in limine, the prosecutor clarified that she would introduce the MDIC interview only if S. testified, which she anticipated would occur. The trial court indicated that if S. testified, there would be no confrontation issue, and the interview would be admitted so long as section 1360's requirements were met. Channoi's counsel responded, "Our only request in that regard, . . . is that until [S.] testifies, I don't believe the foundational requirements of [section] 1360 [have] been met, so we would just ask that she testify first." The prosecutor and court agreed that playing the interview after S. testified was appropriate.

Before S. testified, the trial court held a hearing on the MDIC interview to determine whether, under section 1360, subdivision (a)(1), "the time, content, and circumstances of the statement provide[d] sufficient indicia of reliability." A Fresno police officer who attended the MDIC interview testified about its relevant aspects. After watching the interview, the court ruled that it was admissible under section 1360.

At trial, the prosecutor asked S. whether she remembered certain aspects of the MDIC interview. S. indicated she remembered pointing out

"private parts" on a diagram, being asked about Channoi, and identifying Channoi's picture from a group of photographs, but she did not remember "talk[ing] about what happened with [Channoi]" with the interviewer. After S. testified, the recording of the MDIC interview was played for the jury without further objection by the defense.

After both sides rested, Channoi moved under section 1118.1 for a judgment of acquittal of the offenses against S. In arguing the motion, Channoi's counsel stated he believed the MDIC interview was admitted on the issue of S.'s credibility, not for the truth of her statements. Counsel argued that the interview was thus insufficient standing alone to prove that he had sexual intercourse with S., as required to convict him under section 288.7, subdivision (a) (one of the charges on which the jury hung). The trial court responded that the interview statements were in fact admitted for their truth under section 1360.

Channoi's counsel then argued that relying on the MDIC interview to convict Channoi of the sexual-intercourse count would violate Channoi's right to confrontation. Counsel explained, "[W]e never had an opportunity to confront because when . . . [S.] was here, she said she didn't remember [the forensic interview], at least that aspect of her statement [about sexual intercourse]."

The trial court denied the section 1118.1 motion, because "[S.] testified so she was subject to cross-examination." Although acknowledging S. could not remember most of the MDIC interview, the court told Channoi's counsel, "[Y]ou could have cross-examined her further as to that. For example, you could have shown her the transcript. You could have shown her the video to see [if] that would have refreshed her recollection and asked her more questions about it."

23

In the motion for a new trial, Channoi raised the issue again, arguing that the MDIC interview's admission violated his right to confront witnesses. He claimed that S. should have been deemed an unavailable witness to the extent she could not remember the interview. He further claimed that S. "refuse[d] to submit to full cross-examination," and therefore either her testimony should be stricken or a new trial should be ordered. The trial court rejected these claims, concluding there were no grounds to determine that S. was unavailable as a witness or that she was not subject to cross-examination.

### 2. Analysis

Channoi claims that "[b]ecause [S.] testified she had no memory of the forensic interview . . . at trial, she should have been deemed unavailable and uncorroborated as to that matter, under Evidence Code [sections] 1360[, subdivision ](a)(3)B[,] 240[, subdivision](a)(2)[, and ]702." He argues that the admission of the MDIC interview therefore violated his constitutional rights to confrontation because S. was not subject to cross-examination. We review evidentiary rulings under state law for an abuse of discretion and Confrontation Clause claims de novo. (*People v. Geier* (2007) 41 Cal.4th 555, 586 (*Geier*); *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964 (*Giron-Chamul*).)

We begin by addressing Channoi's argument that S. should have been deemed an unavailable witness. Under section 1360, subdivision (a)(3), one requirement to admit the statement of a child-abuse victim is that "[t]he child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." Here, S. testified at trial under subdivision (a)(3)(A), so the interview was

24

admissible without the need for corroboration under subdivision (a)(3)(B).

Nor do the other statutes Channoi cites suggest that S. was effectively unavailable to testify. Under Evidence Code 240, subdivision (a)(2), a declarant is "unavailable as a witness" if the declarant is "[d]isqualified from testifying to the matter." In turn, under Evidence Code section 701, a provision Channoi does not cite, a witness is disqualified from testifying "if he or she is: [¶] (1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him [or her]; or [¶] (2) Incapable of understanding the duty of a witness to tell the truth." Channoi provides no authority to suggest that the inability to remember something "disqualifies" a witness within the meaning of these statutes. Rather, section 702, the provision he does cite, provides merely that "the testimony of a witness concerning a particular matter is inadmissible unless [the witness] has personal knowledge of the matter." (§ 702, subd. (a).) But the fact that a witness's testimony on a particular topic may be inadmissible does not establish that the witness is wholly disqualified from testifying. In short, S. was available to testify and she did testify.

We therefore turn to Channoi's constitutional claim. The federal and state Constitutions guarantee criminal defendants the right to confront the People's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Cromer* (2001) 24 Cal.4th 889, 892.) " 'This has long been read as securing an adequate opportunity to cross-examine adverse witnesses' [citation], which requires that the defendant ' " '[have] an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling [the witness] to stand face to face with the jury' " ' " so that jurors

25

may evaluate the witness's credibility for themselves. (*Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 963.)

Generally, when a witness " 'appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [the witness's] testimonial statements.' " (*People v. Rodriguez* (2014) 58 Cal.4th 587, 632; *People v. Stevens* (2007) 41 Cal.4th 182, 199.) Although Channoi claims that S.'s lack of memory effectively prevented him from cross-examining S., the right to an adequate opportunity for cross-examination "does not entitle defendants to ' " 'cross-examination that is effective in whatever way, and to whatever extent, [they] might wish.' " ' [Citation.] In particular, it ' "includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness'[s] testimony." ' " (*Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 965.) In short, "a witness's failure to remember, whether real or feigned, generally does not deny the defendant an opportunity for effective cross-examination." (*Ibid.*)

Here, the defense had such an opportunity but chose not to exercise it. At one point, Channoi's counsel asked S. whether she "[gave] an interview to a social worker . . . somewhere near the airport, where it was just you and a social worker in a room and it was being video[]taped?" S. answered, "I don't remember." Counsel then asked, "Do you believe you told the truth that day? I'm sorry, you don't remember giving that statement at all?" She responded, "Exactly," and counsel did not ask any more questions about the MDIC interview.

26

As the trial court pointed out in denying the section 1118.1 motion, nothing prevented Channoi from cross-examining S. further about her inability to remember the MDIC interview. For example, in *People v. Cowan* (2010) 50 Cal.4th 401, a witness appeared for cross-examination before the witness's out-of-court statement was admitted through the testimony of another witness. (*Id.* at p. 463.) The Supreme Court rejected the defendant's Confrontation Clause claim, holding that the original witness was available for cross-examination because the defense could have recalled her and cross-examined her about the statement. (*Ibid.*) Here, although S. testified before the MDIC interview was admitted, the parties agreed to this order of evidence, and the defense had notice of the interview's contents. Channoi offers no reason that he could not have asked additional questions about the interview while S. was on the stand. Therefore, no constitutional violation occurred.

F.     *Channoi Fails to Show Error in the Exclusion of Impeachment Evidence Involving S.'s Supposed Criminal Activity*.

Channoi next claims that "the trial court improperly prevented [him] from impeaching [S.] regarding her criminal lifestyle." (Boldface and capitalization omitted.) This contention lacks merit.

1.     Additional facts

Before trial, Channoi moved to admit "related prior sexual conduct" of S. "to show that the perpetrator was someone else." Apparently referring to S.'s interview with his counsel, Channoi alleged that S. had admitted that "it was not [he] who molested her but that she was instead molested by paramours of her drug addicted mother, in order to facilitate her mother's access to drugs." The prosecution moved to exclude evidence of S.'s other sexual activity, including her "possibly being involved in prostitution," unless it was properly introduced under Evidence Code section 782. The prosecution

27

also moved to exclude evidence pertaining to S.'s mother's alleged prostitution and drug use.

The trial court ruled that evidence of S.'s sexual conduct after the charged incident was inadmissible. The court stated it was also inclined to grant the prosecution's motion to exclude evidence about S.'s mother's activities. The court did allow that this evidence might "have some relevance" to "third party culpability," but it indicated that the defense needed proof that another man molested S. before evidence about her mother would be admitted.

As discussed above, at trial Channoi introduced his counsel's interview of S. during which she denied that Channoi molested her. During the interview, S. claimed her report of being abused was misunderstood, and the perpetrator was in fact "one of her [mother's] previous boyfriends." S. stated that when she still lived with her mother, her mother "used to let them do that to [S.]" in exchange for drugs. On cross-examination, S. claimed she could not remember saying these things, although she agreed that her mother "sometimes [brought] suspicious men over" when the two still lived together.

Separately, after the parties had rested, Channoi's counsel told the trial court he had learned that "[S.] was very likely arrested in May of 2017. We have a videotape of her being involved in an altercation at [a] McDonald's where she was one of several people involved in attacking and beating up and stomping . . . a young lady." Counsel asked that the prosecution disclose "if it is even arguable that [S.] was either not charged or given any leniency regarding that matter." The prosecutor responded that she had no such information, and if counsel wanted to obtain information about S.'s possible

28

juvenile record he needed to file a petition under Welfare and Institutions Code section 827 (section 827).

The trial court determined it had insufficient information on which to act. The court had "no information other than [Channoi's counsel's] bald statement on the record that this occurred," and no section 827 petition was ever filed. Moreover, there was no *Brady*[6] issue because the prosecutor denied having information about whether S. received any "special treatment" in another proceeding.

In the motion for a new trial, Channoi argued that the trial court "improperly prevented the defense from impeaching . . . [S.] regarding her criminal lifestyle and recent criminal conduct, since it could reasonably be inferred that a witness [facing] potential criminal consequences could expect to avoid prosecution herself by cooperating." He also submitted several photos of S. he claimed "suggest[ed] she engages in criminal activity." One of the photos showed S. holding what appeared to be a bag of marijuana, and the other photos showed her holding large amounts of cash. Channoi also submitted a video recording of the fight in which S. allegedly participated.

The trial court rejected this ground for a new trial. It began by explaining that the defense's allusion to S.'s "criminal lifestyle" referred to "evidence of supposed prostitution that [defense counsel] wanted to get into." The court reiterated that it found such evidence of post-offense conduct inadmissible under Evidence Code sections 1103 and 352. As for the recording of the fight, the court ruled that it "was not relevant at all to the allegations" and was inadmissible under Evidence Code section 352 (section 352) as both unduly prejudicial and a "waste of time."

---

[6] *Brady v. Maryland* (1963) 373 U.S. 83.

29

### 2. Analysis

On appeal, Channoi confines his argument to the evidence that S. "engage[d] in prostitution" and participated in the fight. He claims that this evidence was admissible to undermine S.'s credibility and that its exclusion violated his right to present a defense.

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction." (*People v. Clark*, *supra*, 52 Cal.4th at p. 931.) In addition, "[e]vidence tending to show a witness has some motive, bias, or interest that might induce false testimony has long been a permissible form of impeachment." (*People v. Mickle* (1991) 54 Cal.3d 140, 168.) These principles are subject to section 352 (*Clark*, at p. 931), which gives a trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) We review evidentiary rulings, including those under section 352, for an abuse of discretion. (*People v. Navarro* (2021) 12 Cal.5th 285, 327; *Geier*, *supra*, 41 Cal.4th at p. 586.)

Once again, Channoi fails to address the bases for the trial court's ruling. In denying the motion for a new trial, the trial court clearly found that any evidence that S. supposedly engaged in prostitution or participated in an attack was inadmissible under section 352. Yet Channoi does not even mention that statute in his argument, except to acknowledge that it applies to impeachment evidence. Nor does he explain why the court's ruling was improper under section 352. As a result, his challenge to this evidence is forfeited.

30

In any case, Channoi does not offer any persuasive reason that the trial court improperly weighed the challenged evidence's probative value in light of the factors counselling against admitting that evidence. He states that "[t]he purpose of this evidence was to show the jury that it could reasonably be inferred that a witness with potential criminal consequences could expect to avoid prosecution herself by cooperating [with the prosecution], even if she testified falsely." But there was no evidence that S. ever faced prosecution for any of her supposed criminal conduct, and Channoi never filed a section 827 petition to seek information about her potential juvenile record. In short, Channoi has not demonstrated that the challenged evidence had any substantial probative value, much less enough to outweigh its undisputedly prejudicial effect. There was no error and, in turn, no constitutional violation. (See *People v. Contreras* (2013) 58 Cal.4th 123, 152.)

G. *Channoi Is Not Entitled to Relief Based on His Claim that S.'s Grandmother's Testimony Was Incorrectly Translated.*

Channoi claims that the conviction involving S. cannot stand because of an error an interpreter made when translating S.'s grandmother's testimony. This claim fails.

S.'s grandmother testified with the assistance of a Lao interpreter. During her testimony, Channoi's counsel asked, "About [10] years ago, did [S.] spend, to your knowledge, any time alone at [Channoi's mother's] house with [Channoi]?" S.'s grandmother's response was translated as "No, I didn't see it." Counsel then asked, "From what you saw . . . [10] years ago, were you worried about [Channoi] doing something to [S.]?" S.'s grandmother's response was translated as "No. I wasn't aware of it. I didn't see it." After counsel followed up by asking whether she was "concerned about it," she responded, "I didn't know it and I wasn't aware of him." Finally, on cross-examination, the prosecutor asked S.'s grandmother, "And there were a few

31

occasions where [S.] would go to your sister's house, but you would not be present, correct?" S.'s grandmother responded that she "didn't see it."

In the motion for a new trial, Channoi claimed the Lao interpreter misinterpreted the word " 'boaemn,' which means 'no, false, or absolutely not[,]' as 'bo hem,' which means 'I did not see it' or 'I was not aware.' " Channoi submitted Lao dictionary definitions supporting this distinction, as well as a declaration from S.'s grandmother in which she confirmed the mistake and stated she did not realize it was made until after trial. Channoi claimed there was "a huge difference" between flatly denying that S. was ever alone with him and indicating a lack of knowledge of the same, arguing that the error "could have provided the scintilla of evidence cynical jurors may have needed to conclude . . . that [he] had an opportunity to molest [S.]" The trial court concluded that even if the word was incorrectly interpreted, it was "harmless error" and did not justify a new trial.

In his opening brief, Channoi repeats word-for-word most of the argument he made in the motion for a new trial, without citing any legal authority to support his claim or explaining why the trial court's ruling was incorrect. Although he attempts to correct these deficiencies in his reply brief, "it is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) Thus, this claim is also forfeited. (See *Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

In any case, we reject the claim on the merits. Channoi argues that the interpretation error "was likely a pivotal consideration for the jury in determining the plausibility of [S.'s] claim of being molested," meaning the error was not harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) Assuming, without deciding, that this is

32

the correct standard for assessing prejudice, we conclude that the error was harmless. Even if the testimony at issue had been translated as an unequivocal denial that S.'s grandmother ever left S. at Channoi's house, we are convinced that the jury would have still convicted him based on the evidence as a whole, including S.'s testimony and his confession.

H. *Testimony by a Defense Witness that She Did Not Know Whether the Charges Were True Does Not Require Reversal.*

Next, Channoi contends the trial court erred by permitting a defense witness to testify about his credibility and the truth of the charges, amounting to an opinion on his guilt. This claim also fails.

K.S., who is apparently related to Channoi by marriage, testified that she had known C. since they were children and had often been around C. at family parties. K.S. offered the opinion that C. was not an honest person.

On cross-examination, K.S. agreed she was not present at the 2011 party. The prosecutor asked her, "And you don't know if the allegations [involving C.] . . . are true or not because you were not present?" After the trial court overruled Channoi's objection to this question, K.S. confirmed she did not know whether the allegations were true.

In moving for a new trial, Channoi argued that the trial court should have sustained his objection to the prosecutor's question for the same reasons he raises on appeal, namely that the question called for improper opinion on his veracity and guilt. The court rejected the argument, finding that Channoi opened the door by asking K.S. about C.'s credibility.

In general, "a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide." (*People v. Houston* (2012) 54 Cal.4th 1186, 1221.) Likewise, "[a] witness may not express an opinion on a defendant's guilt," because such opinions " 'are of no assistance to the trier of fact. To put it

33

another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) Again, we review evidentiary rulings for an abuse of discretion. (*Geier*, *supra*, 41 Cal.4th at p. 586.)

Channoi fails to address the trial court's rationale for the ruling. "'[R]ebuttal testimony . . . may be proper when it is offered as impeachment to meet evidence on a point put in dispute, i.e., specific statements of fact to which the defense has testified.'" (*People v. Senior* (1992) 3 Cal.App.4th 765, 778.) Even if K.S.'s opinion about the truth of the allegations was otherwise inadmissible, we agree with the trial court that Channoi opened the door by eliciting her sweeping opinion that C. was not credible. By offering that opinion, K.S. necessarily suggested that the charges involving C. were untrue. The prosecutor was therefore entitled to cross-examine K.S. on her knowledge of that topic. Channoi offers no argument otherwise.

Moreover, even if the trial court erred by permitting the prosecutor to question K.S. about the truth of the allegations, the error was harmless. "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) The brief testimony of a nonpercipient witness that she did not know whether the charges were true could not have swayed the jury to convict Channoi of the offenses against C. Channoi admitted to having sex with C. in his interrogation and during both calls with her father, which collectively constituted powerful evidence that he molested her. Also, the jury was instructed that it alone was responsible for judging witnesses' credibility and the truth of the charges, and we must

34

presume it followed these instructions. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.) The challenged testimony was not prejudicial.

I.    *The Trial Court Did Not Err by Failing to Investigate Allegations of Jury Misconduct Supported Only by Counsel's Hearsay.*

Channoi contends the trial court erroneously failed to investigate jury misconduct he identified. We are not persuaded.

In the motion for a new trial, Channoi claimed the defense's interviews of three jurors showed that "at least some jurors (1) disregarded the lack of evidence of [S.'s] ever being with [him] in 2007 or 2008 in a position where [S.] could have been molested[,] based on sympathy for what she allegedly endured as a child; (2) presumed that [his] verbal comprehension was greater than the evidence suggested it was based on the mere fact that he was seen communicating with counsel and writing on a notepad during trial[7]; and (3) refused to deliberate or consider in good faith the viewpoints of other jurors." Channoi also submitted his counsel's declaration that "all . . . factual representations" in the motion were "true and correct to the best of [counsel's] knowledge."

The trial court concluded there was insufficient evidence of jury misconduct, since Channoi did not submit any "declarations by any jurors" and the only support for the claim was "hearsay statements of counsel." Channoi's counsel responded that he had "tried to get declarations from the jurors," but they were "reluctant" to cooperate. The court indicated it

---

[7] A psychologist testified that Channoi had a verbal comprehension IQ score of 68, which is "extremely low with regard to verbal ability," but scored in the normal range in other categories. The defense relied on this evidence to argue that Channoi was "vulnerable to . . . interrogation" and falsely confessed.

understood but could not "rely upon hearsay statements to overturn a verdict."

"Jury misconduct serious and extensive enough to impair the fairness of the trial or deliberations may warrant granting a new trial motion." (*People v. Flinner* (2020) 10 Cal.5th 686, 755.)  Once a trial court "is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter," but this obligation is triggered "only when the defense comes forward with evidence that demonstrates a 'strong possibility' of prejudicial misconduct." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255, italics omitted.)  Our state Supreme Court has repeatedly affirmed that " '[h]earsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 517, quoting *People v. Manibusan* (2013) 58 Cal.4th 40, 55; *People v. Dykes* (2009) 46 Cal.4th 731, 810; *Hayes*, at p. 1256.)

Channoi fails to explain why this principle does not foreclose his claim. He does not contest that his counsel's declaration, which adopted the motion's descriptions of what jurors said during interviews, amounted to hearsay.  He asserts that allegations of jury misconduct "by an officer of the Court under penalty of perjury required investigation," but there is no exception under which a trial court must investigate based on hearsay if it is counsel's hearsay.  He also cites *People v. Hedgecock* (1990) 51 Cal.3d 395 for the proposition that "juror misconduct can be based on credible allegations of misconduct, even if [the] proof supporting those allegations . . . [is not] admissible."  But that decision held that "when a new trial motion in a criminal case is based on allegations of juror misconduct, the trial court may

conduct an evidentiary hearing to determine the truth of the allegations," and it says nothing about what type of allegations justify such a hearing. (*Id.* at pp. 414–415.) In short, no abuse of discretion appears.

> J.    *Channoi's Constitutional Challenges to Section 667.61 Fail.*

Turning to the sentence, Channoi claims that section 667.61, the One Strike law, is unconstitutional because it "removes individualized sentencing discretion" and "permits automatic imposition of indeterminate sentences without the jury's making findings relative to the appropriate punishment." He also suggests that the sentence imposed on him amounted to cruel and unusual punishment. We reject these claims.

The One Strike law "was ' "enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction." ' " (*People v. Garcia* (2017) 17 Cal.App.5th 211, 223). The statute provides for indeterminate sentencing if a person is convicted of specified offenses, including lewd acts under section 288(a), under qualifying circumstances. (§ 667.61, subds. (a)–(c), (j), (*l*)–(m).)

As relevant here, one such circumstance is that "[t]he defendant has been convicted in the present case or cases of committing [a specified] offense . . . against more than one victim." (§ 667.61, subd. (e)(4).) If a defendant is convicted of a specified offense "under one of the circumstances specified in subdivision (e)," including the multiple-victim circumstance, the required term is 15 years to life. (§ 667.61, subd. (b).) And as of 2010, if a defendant is convicted of a specified offense under one such circumstance "upon a victim who is a child under 14 years of age," the required term is 25 years to life. (§ 667.61, subd. (j)(2); Stats. 2010, ch. 219, §§ 16, 29.) Here, since the crime against S. was before 2010, Channoi was sentenced to 15 years to life for that

37

offense under section 667.61, subdivision (b), whereas he was sentenced to 25 years to life for the offense against C. under subdivision (j)(2) of the statute.[8]

In the motion for a new trial, Channoi claimed that a life sentence under section 667.61 would constitute cruel and unusual punishment as applied to him. He argued that the multiple-victim enhancement should therefore be stricken. At the hearing on the motion, the trial court declined to strike the enhancement, finding that it did not have authority under section 667.61 to do so. Channoi's counsel then observed that "the law as it currently exists really prevents the Court from rendering an individualized sentence," and the court responded that it "[did] not disagree . . . but there's not much [it could] do about that."

Generally, "[w]e review questions regarding the constitutionality of a statute de novo." (*People v. Solis* (2020) 46 Cal.App.5th 762, 771.) In particular, we independently review "the constitutionality of a statutorily mandated sentence." (*People v. Baker* (2018) 20 Cal.App.5th 711, 722.)

On appeal, Channoi first argues that the One Strike law is unconstitutional because "it removes individualized sentencing discretion that the constitution requires." The only decision he cites is *Lockett v. Ohio* (1978) 438 U.S. 586, which held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Id.* at

---

[8] Although the jury did not make a separate finding under section 667.61, subdivision (j)(2), it found the multiple-victim circumstance true and also found that Channoi was ineligible for probation as to that offense because he "had substantial sexual conduct with a victim under the age of 14 years."

38

p. 604, fn. and italics omitted (plur. opn. of Burger, C.J.).)  In other words, "[a] *capital* sentencing decision must be individualized, and the sentencing authority must be permitted to consider the defendant's character." (*People v. Peoples* (2016) 62 Cal.4th 718, 757, italics added.)

Although Channoi acknowledges that this authority addresses only death-penalty cases, he argues that "there is no principled distinction that would allow someone's life to be terminated only individually, but one's freedom to be deprived without similar consideration."  But " '[t]he penalty of death differs from all other forms of criminal punishment, not in degree but in kind.  It is unique in its total irrevocability.  It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.  And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.' " (*Harmelin v. Michigan* (1991) 501 U.S. 957, 995–996 (plur. opn. of Scalia, J.).)  The United States Supreme Court has concluded that this "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." (*Lockett v. Ohio*, *supra*, 438 U.S. at p. 604 (plur. opn. of Burger, C.J.).)  Thus, while "individualized sentencing determinations" in noncapital cases may reflect "enlightened policy," they are not constitutionally required. (*Woodson v. North Carolina* (1976) 428 U.S. 280, 304 (plur. opn. of Stewart, J.); see, e.g., *Harmelin*, at p. 996 (plur. opn. of Scalia, J.) [declining to require individualized sentencing when imposing term of life without possibility of parole].)  Channoi was therefore not entitled to individualized sentencing under *Lockett*.[9]

---

[9] For the first time in his reply brief, Channoi also "argues for an extension of . . . *Miller v. Alabama* (2012) 567 U.S. 460" to require individualized sentencing here, because even though he was not a juvenile at the time of the offenses, "it is now well recognized that the adolescent brain

Channoi also contends that section 667.61 is unconstitutional because it "permits [the] automatic imposition of indeterminate sentences without the jury's making findings relative to the appropriate punishment." He relies solely on *United States v. Haymond* (2019) 588 U.S. \_\_, 139 S.Ct. 2369, which addressed a federal statute requiring a trial court to impose "an additional prison term of at least five years" if the court found "by a preponderance of the evidence that a defendant on supervised release committed one of several enumerated offenses." (*Id.* at p. 2374 (plur. opn. of Gorsuch, J.), citing 18 U.S.C. § 3583(k).) A plurality of justices held that the statute violated the Fifth and Sixth Amendments because "a jury must find any facts that trigger a new mandatory minimum prison term." (*Haymond*, at p. 2380 (plur. opn. of Gorsuch, J.), italics omitted.)

The *Haymond* plurality "relied on a line of cases, beginning with *Apprendi v. New Jersey* (2000) 530 U.S. 466, which held that 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum' '[o]ther than the fact of a prior conviction' 'must be submitted to a jury, and proved beyond a reasonable doubt.' " (*People v. Martin* (2020) 58 Cal.App.5th 189, 192, quoting *Apprendi*, at p. 490.) But here the jury *did* find true beyond a reasonable doubt the circumstances required to impose an indeterminate sentence under section 667.61. Channoi does not identify any other findings the jury had to make for his sentence to be constitutional under *Apprendi* or related authority.

Finally, Channoi cursorily claims that his sentence constituted cruel and unusual punishment. To resolve such a claim, "[a] reviewing court determines whether a particular penalty given ' "is so disproportionate to the

---

does not fully mature until one's mid-twenties." We decline to consider this argument. (See *People v. Tully*, *supra*, 54 Cal.4th at p. 1075.)

crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235; U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)  Usually, the analysis involves three factors:  " 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society' "; a comparison of "the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction"; and a comparison of "the challenged punishment to [the] punishments for the same offense in other jurisdictions." (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296–297.)

Channoi mentions his "lack of any prior record" and "his intoxication at the time of the . . . offenses," but he otherwise fails to address the relevant considerations.  He does not minimize the seriousness of his crimes or explain why a relatively long indeterminate sentence was otherwise inappropriate.  We cannot conclude that section 667.61 is unconstitutional as applied based merely on the mitigating circumstances he identifies, which exist in numerous cases.  Therefore, we must reject the claim that his sentence constitutes cruel and unusual punishment.

### K.    *No Cumulative Error Appears.*

Finally, Channoi contends that even if harmless individually, the errors he alleges cumulatively require reversal of his convictions.  The only possible errors we have identified involve the mistranslation of S.'s grandmother's testimony and K.S.'s opinion about the truth of the charges involving C., but these errors were harmless even if considered cumulatively.  Accordingly, this claim fails.

### III.
### DISPOSITION

The judgment is affirmed.

41

_____

Humes, P.J.

WE CONCUR:


_____

Margulies, J.


_____

East, J.*


*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Channoi*  A164247